## CORAY v. HOLBROOK et al.

No. 2268. Decided January 30, 1912 (121 Pac. 572).

1. TRUSTS—PAROL TRUSTS—EVIDENCE—SUFFICIENCY. One suing to declare and enforce a parol trust must show, with at least reasonable certainty, the terms of the trust, and the court, from the language used, the acts and conduct of the parties, and the surrounding facts, must be able to ascertain, with at least reasonable certainty, the essential terms of the trust before it can declare and enforce it. (Page 332.)

2. TRUSTS—PAROL TRUSTS—EVIDENCE—SUFFICIENCY. Evidence *held* not to support a finding that a party agreed to make an appropriation of water for irrigation in trust for another, or to secure for others an interest in a corporation formed to acquire water rights for irrigation. (Page 333.)

3. WATERS AND WATER COURSES—APPROPRIATION OF WATER RIGHTS FOR IRRIGATION—ACTS CONSTITUTING. A party, to acquire under the statute a right to the use of unappropriated waters for irrigation, must take, divert, and use the waters; and the making of a survey and the posting of a notice of appropriation confer no rights. (Page 338.)

4. JUDGMENT—CONFORMITY TO PLEADING AND PROOF. Plaintiff may not recover on a theory on which the complaint is not based, and to which the evidence was not directed. (Page 341.)

APPEAL from District Court, Fourth District; *Hon. J. E. Booth,* Judge.

Action by Elizabeth H. Coray, as administratrix of the estate of Don R. Coray, deceased, against LaFayette Holbrook and W. B. Searle, in which defendant W. B. Searle filed a counterclaim against defendant Holbrook.

Judgment for defendant Holbrook. Plaintiff and defendant Searle appeal.

AFFIRMED.

*Dey & Hoppaugh* and *E. A. Walton* for appellant Coray.

*E. E. Corfman* for appellant Searle.

*E. C. Lackner, F. F. Steigmeyer* and *J. W. N. Whitecotton* for respondent.

STRAUP, J.

The plaintiff, the administratrix of the estate of Don R. Coray, deceased, brought this action against the defendants Holbrook and Searle for an accounting and to recover whatever money and property might be found due her.

The substance of the complaint is that the deceased and the defendant Searle, in 1892, 1893, and 1894, explored, investigated, and surveyed Provo River and canyon, selected reservoir sites, made maps, drawings, and plans for the purpose of establishing and locating reseovoir sites, and for developing and diverting water for irrigation and for power for the gen-

eration of electrical energy for light and power, and that the water and water rights and reservoir sites so selected were then unappropriated, and were subject to appropriation for such purposes.

It is further alleged:

"(5)  That while so engaged in said acts of appropriation they employed the defendant Holbrook as their trustee and agent in the consummation of said appropriation and in the formation of said plan, and to aid and assist them in making a practical use and disposition of the said properties and interests then owned by them and to be acquired in the further progress of said project; and it was then and there agreed between said Coray, Searle, and Holbrook that the said Holbrook would secure a purchaser, or interest other parties with capital, who would take over the said interests and property of the said Searle and Coray then owned and to be further acquired in the development of said plan. That it was then agreed between the said Coray, Searle, and Holbrook that Holbrook would, in his own name, as trustee, and in trust for said Searle and Coray, locate the reservoir sites pointed out to him and theretofore selected by said Searle and Coray, and make appropriations, as such trustee, of said waters and water rights for said purposes, and the said Holbrook then and there agreed to secure for said Searle and Coray ten per cent of the capital stock of any corporation thereafter organized to take over said plan and properties, or any corporation that might be formed, based upon the proposition and scheme involved in the said appropriations, surveys, and other work of and acts of the said Searle and Coray in the premises; and it was further agreed that the said Holbrook should receive as his compensation one-third of whatever should be realized from said interests."

It is then alleged that Holbrook, as trustee for Searle and Coray, located the reservoir sites and water rights or water power to generate electric energy for light and power at the places indicated to him by Searle and Coray, and "thereafter procured divers parties to become interested therein and a certain corporation to be formed, based upon said appropriations

and properties of the said Searle and Coray," and "transferred and conveyed all of said property to the Telluride Power & Transmission Company," and that Holbrook received from the Telluride Power Company, "on account of said property and interests and rights transferred" by him to it, "large sums of money and large amounts of stock and property, amounting in the aggregate to at least $200,000." It is further alleged that a demand was made on Holbrook, on or about the 7th day of April, 1905, for an accounting, and that he refused to account.

Upon these allegations the plaintiff asked that Holbrook be required to account, and that she be given a "judgment for whatever amounts, both of money and property, may be found due her, and for an undivided one-third of all the moneys and property which the said Holbrook has received on account of said Don R. Coray, deceased," and for general equitable relief.

It is alleged in the complaint that the deceased died on the 18th day of October, 1899, and that the plaintiff was appointed administratrix of his estate in February, 1905, and that no administration of the estate had theretofore been had.

The defendant Searle filed an answer, admitting all the allegations of the complaint, and filed a counterclaim against Holbrook, in which the same allegations are made as are contained in the complaint. The defendant Searle, in effect, is a plaintiff as against Holbrook, and seeks the same relief sought by the plaintiff. They may therefore both be treated as plaintiffs.

Holbrook filed an answer to the complaint and counterclaim, admitting the demand for an accounting and his refusal to account, and denying all other allegations of the counterclaim and of the complaint, except the death of the deceased and the appointment of the plaintiff as administratrix of his estate. He also pleaded the statute of frauds, alleging that the contract or agreement set forth in the complaint and counterclaim was not in writing nor evidenced by any memorandum, and that the alleged trust or relation was

not declared, granted, or created by any writing or memo-
randum, and as is in such case required by section 2461, R. S.
1898, and the statute of limitations, alleging that the action
was not commenced within four years after the cause of action
accrued, and as in such case provided by section 2883, R. S.
1898.

The case was tried to the court, who found the issues in
favor of the defendant.

The court found that Searle and Coray, in 1892, 1893, and
1894, made preliminary surveys of the canyon "at a cost of
not exceeding $1000, including rough maps and sketches of
said surveys, looking to the establishment of reservoir sites
and the development of water power"; that in the year 1894
they had a conversation with Holbrook "in relation to the
disposition of any rights that they might have acquired in
said canyon and river; but no agreement was entered into con-
cerning the same." The court further found that Holbrook
made no location or appropriation of reservoir sites, or water
rights, as trustee for Searle and Coray; that he procured no
one to become interested, or any corporation to be formed,
based upon any appropriations or properties of Searle and
Coray; that he received no property from them and held none
in trust for them, nor transferred, nor conveyed, any to the
Telluride Power Company, or to any one; and that he re-
ceived nothing from the Telluride Power Company, or any
one, "on account of any property in which they, or either of
them, had any interest." No findings were made in respect
of the special pleas of the statute of frauds and of limitations;
and, if the findings which were made by the court are correct,
no findings on such pleas were necessary.

A judgment was entered in favor of the defendant, dis-
missing the complaint and counterclaim on the merits, from
which both plaintiffs have prosecuted this appeal. They as-
sail the findings.

The evidence shows substantially the following facts:

Searle and the deceased, prior to 1894, made explorations
and a survey of the canyon, and in 1892 posted a notice along
the river at a point called "Hanging Rock," to obtain and

divert water of the river at that point for power and irrigation purposes. The notice was not recorded; nor was there any work done or commenced by them, except the making of the survey and the posting of the notice. They were unable to finance or proceed with the contemplated enterprise. In the summer or early fall of 1894, they spoke to Holbrook about it, and interested him in it. Some verbal negotiations and understanding were then had with him to the effect that he was to interest others of means and capital. The terms of such negotiations or undestanding will be referred to later. Thereafter Holbrook interested a Mr. Nunn and his associates, who later organized the Telluride Power Company, and who made an appropriation and diversion of water of the river for power and other purposes, and constructed and operated a power plant for the generation of electrical energy for light and power. Holbrook first conversed and negotiated with Mr. Nunn about the matter in the summer or fall of 1894, either shortly before or after his talk and negotiations with Searle and the deceased. Nunn then already had some knowledge of and some acquaintance with the canyon from reports made to him by his engineer, who had visited and explored the canyon in 1893. Nunn and Holbrook, after their conversation, and in September, 1894, visited the canyon and drove along the river. Later Nunn sent his engineer to the canyon, who made explorations and a survey with a view of obtaining and diverting water from the river for power and other purposes. In October, 1894, Holbrook posted a notice, in the name of "L. Holbrook, Trustee," along the river, to obtain and divert water of the river for power and other purposes, at a place called "Bridal Veil Falls," which is more than a mile down the river from the place where Searle and the deceased had posted their notice. Thereafter Holbrook assisted Nunn and his associates in making further surveys, building flumes, diverting the water, and constructing a power plant. The deceased for a time, and Searle for a long time, were also employed by Nunn and his associates in and about the work, as well as other work, and for which they were paid by Nunn and his associates. The work was completed and

the plant constructed in 1897 or 1898; the record not clearly disclosing the exact time.

In 1905, Holbrook, for his services, received from Nunn 5000 shares of the capital stock of the Telluride Power Company and 5000 shares of the capital stock of the Sam Magill Consolidated Gold, Mining & Power Company, a corporation in which Nunn and his associates were also interested. The stock was a reissue of stock issued to Holbrook in 1897. The evidence is in conflict as to whether the maps and drawings of Searle and the deceased were delivered and turned over to Holbrook. Searle testified that they were delivered to Holbrook, or to his representatives. Holbrook denied it. In 1896 or 1897, litigation was pending between the Rio Grande Western Railway Company and the Telluride Power Company in respect of conflicting rights in the canyon. Nunn and his associates then, through their engineer, obtained from Searle the field notes of the survey of Searle and the deceased, which, as testified to by Searle, were used on the trial of that action. He testified that their maps and drawings were also used for that purpose. Nunn testified that he received the field notes from Searle, and that he received the maps, as he thought, from Holbrook, but denied that they were used at the trial, or that they were obtained for such purpose. Nunn testified that the field notes were received by him in respect of an option taken by him on some reservoir sites up the stream, in which Searle and the deceased claimed some interest, but which were wholly separate and distinct from the project and enterprise which culminated in the construction and operation of the power plant. Searle testified that the field notes were delivered to Nunn upon an express agreement that Nunn was to pay him the sum of $2500 for them, but that he received from Nunn only $250. He testified that Holbrook had an undivided one-third interest in them, and that he offered to divide with Holbrook the money received by him; but Holbrook told him to keep it, and stated that "there was a great deal more coming in the final settlement." Searle thereupon kept $125 and paid $125 to Coray. Nunn denied that he had agreed to pay Searle that

sum, and testified that he had paid him $250 upon the option heretofore referred to, but which was not taken up by him. It is not made to appear that the deceased, his heirs or representatives, made any demand on Holbrook for an accounting prior to 1905. Searle testified that he made numerous demands on him between the years 1895 and 1904. and that Holbrook at no time disclaimed or disputed that anything was due Searle or Coray until in 1904, and that he, until then, always asserted that he had not yet had a settlement with Nunn and his associates. Holbrook testified that no such demands were made until in 1904.

The Telluride Power Company was incorporated with a capital stock of 2,000,000 shares of a par value of one dollar each, and the Sam Magill, etc., Mining Company of 1,500,000 shares of a par value of one dollar each. There is no evidence to show the value of any of theses shares, nor the value, character, or extent of the property or plant owned or operated by either of these companies, nor the business conducted by them, except as may be inferred from their corporate names.

Upon substantially these facts, the plaintiffs assert that a trust relation existed between Searle, Coray, and Holbrook, and that Holbrook ought to be made to account. The court disposed of the case by finding that there was no agreement between them, and that Holbrook did not do or receive anything in pursuance of any agreement or understanding between them, and did nothing and received nothing in their behalf, or for their benefit. While we think this evidence shows that there was some kind of an agreement or understanding between Searle and the deceased and Holbrook, and that there existed some kind of a relation or agency between them, yet we are unable on the record to ascertain with reasonable certainty the terms of the agreement or understanding, and the nature and extent of the agency or relation. One seeking to have rights declared and enforced, founded upon a verbal or written agreement, and involving or growing out of an alleged trust or confidential relation. is required, among other things, to show, with at least reasonable certainty, the terms of the agreement and the character and

extent of the trust or confidential relation. These things cannot be left to loose or flexible language, or to vague or indefinite terms. The court, from the language used, from the acts and conduct of the parties, and from all the facts and circumstances surrounding the alleged agreement, and under which it was made, must be able to ascertain, with at least reasonable certainty, the essential terms of the agreement and the character and extent of the alleged trust or confidential relation.

These are alleged in paragraph five of the complaint. In substance, they are that Holbrook agreed to "secure a purchaser, or interest others with capital, who would take over the said interest and property" of Searle and the deceased "then owned" and to be acquired by them; to "locate in his own name, as trustee for Searle and the deceased, the reservoir sites pointed out to him and theretofore selected by" them; "to make appropriations, as such trustee, of said water and water rights" for the development of their contemplated plan; and "to secure for Searle and Coray ten per cent. of the capital stock of any corporation that might be formed, based upon the proposition and scheme," etc. We do not think that the essential features of these allegations are supported by the evidence, or that the evidence shows the essential features of an agreement and the character and extent of the relation existing between the parties with such certainty as to enable us to ascertain and declare the terms and conditions thereof. There is no evidence to support the allegation that Holbrook agreed to locate "in his own name, as trustee, and in trust for said Searle and Coray," or otherwise, the reservoir site or sites "pointed out to him, and theretofore selected by said Searle and Coray, and to make appropriations as trustee," or otherwise, "of said water and water rights for said purpose." The only evidence bearing upon that is the testimony of Searle that after Holbrook posted the notice at Bridal Vale Falls, a place more than a mile below the place selected by Searle and Coray, Holbrook told him that such location was made by him "as trustee for Searle and Coray," and that he (Searle) protested

against the posting of the notice at that point, because it "practically threw away one-third of the power," and that Holbrook told him that Nunn and his associates desired it made at that point. Holbrook denied this conversation, and testified that he made the location in trust for Nunn and his associates. In this Holbrook was corroborated by Nunn and two other witnesses, one of whom drew up the notice to be posted for Nunn. The finding, therefor, made by the court that the notice posted by Holbrook and the appropriation made by him were not in trust for Searle and the deceased is supported by the preponderance and greater weight of the evidence.

The only evidence tending to support the other portions of the alleged agreement is the testimony of Searle and Moore, witnesses for the plaintiffs, and that of Holbrook, a witness in his own behalf. Searle testified that in the conversation with Holbrook in the summer or early fall of 1904 Holbrook "stated that he belived that he could find parties to carry out and make the developments in Provo Canyon of the interests that Mr. Coray and I held there. Mr. Holbrook had been told all our plans in connection with that development. I told Mr. Holbrook to represent me in the disposal of the rights we then held in Provo Canyon. I said, 'You shall represent me entirely.' Coray and I were together, and the conversation was directed to the entire interests, and I said, 'And any arrangements you may make which you deem just and equitable I will accede to.' Mr. Coray made the statement to Mr. Holbrook that he should represent him entirely in the disposal of his interests there and in the water power and irrigation. The value of the water rights was discussed, and it was conceded and expressed by each of us that a one-tenth interest in the developed plant, irrigation or power, would be a just and equitable recognition of the rights represented in the location and plans as then in existence. Mr. Holbrook stated that he believed a one-third interest of our rights there should accrue to him in the enlistment of capital to develop it, and I stated to him I was satisfied with that, and Mr. Coray stated the same, and Mr. Holbrook afterwards stated that was the

interest he held in the Coray & Searle location in Provo Canyon. Mr. Holbrook agreed to enlist capital under the conditions of this agreement."

Searle further testified that in another conversation had with Holbrook in 1904 he "asked Holbrook whether he had had a settlement with Mr. Nunn. He said, 'I thought there was some kind of a settlement a long time ago.' I said, 'There was never any settlement of the interests you represented, or accounted for by you.' He said, 'Wasn't there a payment made by Mr. Nunn on his purchase of Coray and Searle of certain notes?' I said: 'But you, as trustee for Coray and Searle, interested Mr. Nunn and capital here, and you made certain locations up there, and there has never been any settlement of that.' He said, 'What was that payment?' I said, 'Mr. Nunn agreed to pay $2500 for the notes representing the early surveys of Coray and Searle just prior to his suit with the Rio Grande. $250 was paid under that agreement, $125 of which came to me. I wanted to tender you one-third of the $125; but you declined, stating that there would be a great deal of money coming at the final settlement; that you did not need this now, and I retained the entire $125. As trustee for Coray and Searle, you made certain water locations and have carried on the negotiations with Mr. Nunn.' He said, 'Yes.' I said, 'Now, what I want to know is, has there been any settlement in connection with that?' He said: 'I haven't my notes with me; my books have been burned up, and I thought that was finished. I must look that matter up.' Mr. Holbrook at that time asked me what was the agreement between the parties, referring to Coray, Holbrook, and Searle. I answered that we should receive a one-tenth interest in the developed plant. He said: 'Why, that cannot be true. Look at the money they have spent here—the immense amount of expenditures.' I said: 'That is true; but at the time this agreement was made Coray and Searle had a good deal more money actually expended there than any one else; and it was agreed between us that one-tenth would represent an equitable payment of the rights then held.' Mr. Holbrook distinctly assented that

that was the agreement; that is, that each one of us would have a one-third interest."

Moore, Searle's brother-in-law, testified that he was "present at this conversation, and that Searle said to Holbrook, 'You remember you were acting as trustee for Mr. Coray and I, and that we were to share one-third each,' and Mr. Holbrook said that was his impression." On cross-examination, he testified: "I didn't hear Searle say that a one-tenth interest had been definitely agreed upon."

Holbrook denied this conversation, and testified that in 1894 Searle and Corey spoke to him about an irrigation proposition which they had in the Canyon, and "I remember that they stated that if I could help them that I could have an interest with them; and I don't remember whether at this time, or if it was subsequently, that it was stated that I could have a third interest; or, in other words, there being three of us interested, each of us would have a third. I remember distinctly stating at that time that anything I could do for them I would be glad to, or for any one else that had anything that would tend to develop the country."

We think this testimony does not support the essential features of the alleged agreement. We have already observed that there is no evidence to support the allegation that Holbrook had agreed to locate the reservoir sites pointed out to him and theretofore selected by Searle and the deceased, or to make appropriations of water and water rights in trust for Searle and the deceased, or otherwise. And we are also of the opinion that the evidence referred to does not support the allegation that Holbrook "agreed to secure for said Searle and Coray ten per cent of the capital stock of any corporation thereafter organized to take over said plant and property, or any corporation that might be formed, based upon the proposition and scheme involved in the said appropriations, surveys, and other work of and acts of the said Searle and Coray in the premises." The nearest of any evidence bearing on that is the testimony of Searle, wherein he testified that 'it was conceded and expressed by each of us that a one-tenth interest in the developed plant, irrigation or power, would be a just

and equitable recognition of the rights represented in the location and plans then in existence." But such language does not show that Holbrook had agreed to organize or cause to be organized a corporation to complete the location and contemplated appropriation and diversion of the waters, or to construct a plant, and especially that he agreed that Searle, Coray and Holbrook should have or receive in equal proportions "one-tenth of the capital stock" of such a corporation, or of "any corporation, based upon the proposition or scheme involved," etc. To so construe the language of the witness, "one-tenth interest in the developed plant, irrigation or 'power," requires too much to be read into it. The language is so vague and indefinite that no reasonable certainty can be given it. Nor is the meaning of it rendered reasonably certain when considered in the light of the acts and conduct of the parties. Had it not been alleged in the complaint that Holbrook had agreed to secure for Searle and Coray "ten per cent of the capital stock of any corporation thereafter to be organized," etc., no one in reading the evidence would infer therefrom that such an agreement had ever been made.

Furthermore, a large portion of the complaint proceeds or is based on the theory that Searle and Coray had acquired and "owned and held rights" with respect to the selection of a reservoir site or sites and an appropriation and diversion of waters of the river for irrigation and power purposes; that their "property" or "interests" or "rights so owned and held" by them were either transferred to Holbrook, to be by him turned over to others or a corporation formed by them, or were in some other manner to be taken over by such others or a corporation, for which Searle, Coray, and Holbrook were to receive in equal proportions one-tenth of the capital stock of such corporation; and that Holbrook transferred "said property and interests and rights" to the Telluride Power Company, and received therefor "large sums of money and a large amount of stocks and property," amounting to "at least $200,000." In support of the allegations of such transfer, or making or taking over of such rights, interest, or property, or of any agreement to do so, Searle, the witness whose testi-

40 Utah—22

mony is most favorable to the plaintiffs, testified that he and Coray talked with Holbrook "with reference to financing the proposition," showed him their maps, told him of their plans, and that "I told Mr. Holbrook to represent me in the disposal of the rights we then held in Provo Canyon, and any arrangement you may make which you deem just and equitable I will accede to," and that Coray told him the same. We do not think such language fairly implies that Searle and the deceased assigned, turned over, released, or quitclaimed all or any of the rights held or claimed by them in the Canyon, or that they agreed to do so, or that they agreed to assign or release, or quitclaim such rights to others whom Holbrook might interest in the enterprise. Even though the language is susceptible of such a meaning, nevertheless it it not made to appear that they, verbally or otherwise, in fact assigned or turned over, or released, or quitclaimed, anything, either to Holbrook or to Nunn and his associates, or to the Telluride Power Company, or to any one, in respect of any such "rights, interest, or property."

Again, what were the "rights, interest, and property" acquired, owned, and held by Searle and the deceased "in Provo Canyon," and which they authorized Holbrook "to dispose" for them? Their rights in and to reservoir sites 3 and the appropriation of unappropriated waters of the river for irrigation and power purposes, as alleged in the complaint? They neither acquired nor initiated any such rights. All they did in that respect was the making of a survey and maps and the posting of a notice. Under the statutes then in force, rights to the use of unappropriated waters were not acquired without a taking and diverting and using them. The mere making of a survey and the posting of a notice neither conferred nor initiated any such rights. They therefore had no such "rights, interest, or property" as were subject to sale, assignment, or transfer. All that they had to sell or assign, or make over, was their knowledge and information in respect of the canyon and the river, and of the feasibility of an appropriation and diversion of unappropriated waters of the river for power and irrigation purposes, and the

field notes, maps, and drawings of their survey.  Were these the things to be turned over to Holbrook, or to those whom he might interest in the enterprise, and for which they were to receive one-tenth of the capital stock of a corporation, or "of the developed plant?"  Were they what was meant by Searle's testimony, wherein he testified that "I told Holbrook to represent me in the disposal of the rights we then held in Provo Canyon?"  Were they the "properties and interests then owned by them," and the "properties and interests and rights" transferred by Holbrook to the Telluride Power Company for $200,000?  Were they the "power and irrigation proposition in Provo Canyon," testified to by Searle, "which was initiated by" him and Coray "by the filing [posting] of the appropriation notice in 1892," and which he testified was worth $250,000?  The complaint does not proceed upon, nor does the evidence support, such a theory.  The complaint is based upon, and the evidence is directed to, two theories:   (1) That Searle and the deceased had themselves, in 1892, made or initiated an appropriation of unappropriated waters of Provo River for power and irrigation purposes by the posting of a notice and the making of a survey, and that they had acquired, held, and owned "rights, interests, and property" in and to such waters; and (2) that Holbrook had agreed to make, and that he made, in his own name, and in trust for them an appropriation of such waters for such purposes which he had agreed to, and did turn over to those whom he had interested in the enterprise; and that such things constituted "the property and interests and rights" which it is alleged were transferred by Holbrook to the Telluride Power Company, and not the knowledge or information acquired by Searle and the deceased of the canyon and the river, the feasibility of obtaining and diverting unappropriated waters of the river for power or other purposes, nor their field notes or maps and drawings.   And Searle testified that the field notes and maps were turned over to Nunn, not in pursuance of the agreement had with Holbrook and as part consideration for "one-tenth of the developed plant," but upon a separate and

independent agreement with Nunn that $2500 was to be paid
for them, not to Holbrook, but to Searle and Coray.

The case does not fall within the principle stated in the
cited case of *Stewart v. Douglass,* 148 Cal. 511, 83 Pac. 699,
that, "where one who has, by his own labor and at his own
expense, discovered a mine, but has not made a location
thereof under the mining laws, afterwards discloses to another
the location of such mine, in consideration of and in reliance
upon an agreement or understanding between them to the
effect that the mine, when located, shall be the joint property
of both, and where, in pursuance of such understanding, the
further agreement is then made that the latter will locate the
mine in their joint names, or for the benefit of both, so that
each shall appear to be a half owner thereof, the subsequent
location of such mine by the latter in the name of himself
alone, without the consent of the discoverer, will raise a
resulting trust in favor of the discoverer, with respect to the
half interest which was to belong to him under the agree-
ment;" nor within the principle stated by the courts and
text-writers that, where one furnishes money or supplies to
another to prospect and discover minerals, or where two gc
together upon the public domain to search and explore for
mines, with an agreement that such discoveries and location
of claims shall be for the joint benefit of both, and a discovery
and location is made in the name of one, both, either on the
doctrine of a resulting trust, or that of agency— the acts done
being the joint adventure of both—are entitled to a joint and
equal interest in and to the property; for, as heretofore
observed, there is no evidence to support the allegations of the
complaint that Holbrook agreed to make a location or an
appropriation of the waters for the use and benefit of Searle
and the deceased or otherwise, and the greater weight of the
evidence shows that he made the location and the appropria-
tion, not for the use and benefit of Searle and the deceased,
but for Nunn and his associates. Nor does the case fall
within the principle announced in the cited case of *Beck-
with v. Sheldon,* 154 Cal. 393, 97 Pac. 867; for there the
plaintiff had in fact made appropriations of water, acquired

rights of way and interests in canals, and by deed conveyed them to the defendants, upon a written contract definite and certain in its terms, for the sum of $10,000 and for one-third of the capital stock of a corporation to be organized by the defendants.

The plaintiffs, therefore, are in this situation: They are not entitled to prevail on the theory that they had made an appropriation of unappropriated waters of the river, or that they initiated or acquired any such rights, and assigned and transferred them to Holbrook or to Nunn and his associates; for they made no such appropriation and acquired no such rights, and made no such assignment or transfer, either verbally or otherwise. They are not entitled to prevail on the theory that Holbrook himself agreed to make an appropriation of such water in trust for them or otherwise, or that he in fact made such an appropriation in trust for them or for their benefit; for the greater weight of the evidence does not support that theory. They are not entitled to prevail on the theory that they discovered Provo River, or the canyon, or the feasibility of obtaining and diverting unappropriated waters of the river for power or other purposes, and that they gave Holbrook or Nunn and his associates information of such facts, or turned over to them their field notes, maps, and drawings, with an understanding or agreement that they, as compensation for any such things, were to have and receive an interest in the appropriation and diversion of the waters thereafter to be made and a power plant to be constructed by Holbrook, or those whom he might interest in the enterprise; for the complaint is not founded upon, nor is the evidence directed to, such a theory.

We think the conclusion reached by the trial court and the judgment entered by him are right. The judgment of the court below is therefore affirmed, with costs.

FRICK, C. J., and McCARTY, J., concur.