[Civ. No. 4252. Third Appellate District.—February 25, 1931.]

LUCILLE MORTENSEN, Appellant, v. LOS ANGELES EXAMINER (a Corporation), Respondent.

ATHALIE RICHARDSON, Appellant, v. LOS ANGELES EXAMINER (a Corporation), Respondent.

Randall J. Hood for Appellants.

Lawler & Degnan and Alexander T. Sokolow for Respondent.

MR. JUSTICE PLUMMER Delivered the Opinion of the Court.—The above-entitled actions are based upon the same publications made by the defendant, involve precisely the same points, are presented to us upon this appeal on one set of briefs, and are considered as one case. For convenience, however, we shall follow the procedure adopted in the briefs and consider by name only the case of *Lucille Mortensen* v. *The Los Angeles Examiner, a Corporation,* it being understood, however, that whatever is said as to this case applies equally to the case of *Athalie Richardson* v. *The Los Angeles Examiner.*

At the time of the occurrences hereinafter referred to, the plaintiff was then Miss Lucille Johnsonbaugh, and thereafter married, and prior to the beginning of this action became known as Lucille Mortensen.

This appeal is taken from a judgment of dismissal entered upon an order sustaining a demurrer without leave to amend, interposed by the defendant to the plaintiff's complaint. The action is for damages on account of alleged libelous articles published in "The Los Angeles Examiner," of and respecting the plaintiff.

The record shows that some time during the months of July and August, 1927, a certain action was being tried in the Superior Court of Los Angeles County, wherein Mrs. Madeline Irvine was asking a judgment for separate maintenance, and in which action James Irvine, Jr., had filed a cross-complaint asking for a divorce. In reporting the proceedings of this trial "The Los Angeles Examiner", being a newspaper published in the city and county of Los Angeles, on the twenty-ninth day of July, 1927, published, among other things, the following: "Five Women Accused. Before the Irvine divorce suit got under way, following the completion of Mrs. Irvine's testimony, an additional pleading was filed in which the wife named five women as co-respondents. These women were: Mrs. Schylor, Miss Ruth Robinson, Miss Lucille Johnsonbaugh, Miss Ruth Baldwin and Miss Athalie Richardson." The account as to what

was stated in Mr. Irvine's cross-complaint, not being material here, it is omitted. This publication is set forth in count one of the complaint, and made the basis for the first cause of action. The complaint, as a separate cause of action, alleges that on or about the first day of August, 1927, the defendant published the following alleged defamatory and libelous matter:

"'$500 a month alimony for wife granted. Four women rancher accused of associating with cleared by Judge Guerin's decision.

. "James Irvine, Jr., millionaire Orange County rancher, was yesterday granted a divorce from Madeline Irvine as a climax to a bitterly fought and sensational trial. The decision was handed down by Superior Judge Walter Guerin. Briefly and tersely the judgment of the court found that Mrs. Irvine was guilty of cruel treatment toward her husband and that his charge that she associated with other men was true. At the same time the court held that Mrs. Irvine had failed to prove her charges of misconduct against Irvine. Thus was the good name of four women cleared.

"'$500 a month alimony. Mrs. Irvine, the court stated, shall receive from Irvine $500 a month alimony for a period of five years beginning January 1, 1928. In the event that she remarries alimony shall be reduced to $250 a month. Mrs. Irvine was also allowed additional attorney's fees at $2500, making a total of $7500, paid to her counsel, Lewis Pink.

"Mrs. Irvine sued for separate maintenance, asking $5000 a month alimony, and alleging that her husband was possessed of many millions. She made a general charge of misconduct against him and at the opening of the trial she filed an affidavit setting forth the names of these women. Irvine, represented by attorneys Scarborough and Bowen, filed a cross-complaint for divorce. He charged that his wife caused him mental suffering by getting drunk and dancing in public places. He also charged that she had been indiscreet.

"'Charges Unproven.' Judge Guerin said in his judgment: 'I have carefully considered the evidence and there is a sharp conflict in the testimony. I find that the plaintiff wholly failed to establish any allegations in her complaint.'"

And for a third and distinct cause of action the complaint sets forth an alleged libelous publication which appeared in "The Los Angeles Examiner" on the twenty-eighth day of July, 1927, as follows, to wit:

"Four women accused by Mrs. Irvine. Millionaire husband attracted away from home, declares wife, asking $1000 a month.

" 'Love ended.' Mrs. Madeline Irvine, who yesterday (in) court (said) four women caused husband to break marriage vows. Picture.

"Mrs. Madeline Irvine yesterday told the story of domestic unhappiness with James Irvine, millionaire son of the famous Irvine ranch land baron, and asked Superior Judge Walter Guerin to grant her separate maintenance with $1000 a month allowance.

"In her recital of marital storms, Mrs. Irvine named four young women, who, she charged, were responsible for her husband's asserted straying from his home hearth.

"Week-end party. Although the allegations were based for the most part upon suspicious circumstances, Mrs. Irvine produced a witness who made a direct accusation against Miss Lucille Johnsonbaugh. This episode, something like motion-picture comedy, occurred during a week-end party at the Irvine ranch and took place on the second floor of the house after all the guests supposedly had retired in the rooms to which they had been assigned.

"The witness, Mrs. F. Turley, said that she had been lingering in the hallway, having a chat with a companion, when she heard voices that indicated to her that Miss Johnsonbaugh was not in her own room.

"Stood in hallway. While standing in the hallway, the witness said, she discovered that her suspicions were well founded and gave testimony tending to show that a love-making episode had been carried on. Mrs. Irvine's part in the legal row will be concluded this morning when she is cross-examined by attorney Scarborough, representing her husband. Attorney Lewis Pink, representing the wife, then will rest the separate maintenance suit."

By reference, the first, second, third, fourth, seventh and eighth paragraphs of the first count set forth in the complaint were made parts of both the second and third counts contained in the complaint. The fifth and sixth paragraphs

in the first count of the complaint contained all that is really vital to a determination of the correctness of the order of the trial court. These paragraphs are as follows:

"V. That said defendant, by said article, meant to state, publish and declare, and did publish, state and declare that this plaintiff had been named as a co-respondent in the action at that time pending in the Superior Court of the State of California, in and for the County of Los Angeles, wherein one Madeline Irvine was the plaintiff and James Irvine, Jr., was the defendant, in a separate maintenance suit in which action said defendant had filed a cross-complaint against said plaintiff for divorce, and further intended by the terms of said article so published, to state, publish and declare that this plaintiff was accused of being one of the five co-respondents in said article declared to have been named by said plaintiff in said proceedings; that the term 'co-respondent', so used in said article, as aforesaid, does now, and at all times herein mentioned has had and possessed a well defined and well understood meaning, in that the same is understood to mean a woman or a man charged with adultery in a divorce suit or in a separate maintenance action, and as such proceeded against together with the defendant therein; that by thus designating this plaintiff in said article as being one of the co-respondents so named by said plaintiff Madeline Irvine in said proceedings, it was understood to mean, by those persons reading the said article, that this plaintiff was at that time being proceeded against by the said Madeline Irvine in said proceedings as a co-respondent of and with the said James Irvine, Jr., and that this plaintiff was by virtue thereof charged in said proceedings by said Madeline Irvine with having committed adultery with the said James Irvine, Jr., defendant in said proceedings.

"VI. That said article so published, as aforesaid, was false, untrue and defamatory; that said Madeline Irvine, plaintiff in said proceedings, at no time in said proceedings named this plaintiff as a co-respondent; that no copy of the complaint and summons in said action was ever at any time served upon this plaintiff; that the plaintiff was not a party to said proceedings; that the complaint in said action filed by said Madeline Irvine does not and did not name this plaintiff as a co-respondent; that no amendment to said

complaint so charging this plaintiff with having committed adultery with the defendant therein was ever filed in said action; that in truth and in fact the said action instituted by Madeline Irvine was based and grounded upon the charge of cruelty and the acts of cruelty committed by the said James Irvine, Jr., defendant therein, to and toward the said Madeline Irvine."

The paragraphs of the complaint relative to the defamatory character of the publications, the injury suffered, etc., need not be set forth herein, as they appear to be in the usual form found in complaints based upon alleged libelous publications.

Two sections of the Civil Code are involved in this proceeding, section 45 thereof specifying that libel is a false and untruthful publication which has a tendency to expose anyone to hatred, contempt, ridicule, etc.; and subdivision 4 of section 47 relative to privileged communications. This subdivision eliminates from the law of libel a fair and true report without malice, of a judicial, legislative or other public official proceeding. Much learning and industry have been displayed by counsel in discussing the meaning of the word "co-respondent". In this particular, section 1019 of the Code of Civil Procedure is mentioned as being the legal definition of the word. This section, however, does not contain the word "co-respondent"; it simply provides that when, in an action for divorce, adultery is charged against either party, and the person with whom such adultery is alleged to have been committed by such party, is named in any of the pleadings, a copy of such pleading must be personally served on such named person, etc., and that the person so served shall have the right to appear and plead and be heard in the cause. About the most succinct definition of the word which we have found is that given in 13 C. J. 1236, to wit: "A person summoned to answer a bill, petition or libel, together with another respondent. This term is now chiefly used to designate the person charged with adultery with the respondent in a suit for divorce for that cause, and joined as a defendant with such party." Supporting the text a number of authorities are cited in the footnotes.

Irrespective of the legal and technical definition of the word "co-respondent", it is a well-known fact that the gen-

eral acceptation of the meaning of the word now is that a woman, when named as co-respondent, has been guilty of illicit relations with the man named in the action for divorce, and while technically the word relates to, and its more general use in pleadings means a person named as a third party in an action for divorce, the general meaning of the word, and the general inference to be drawn from the use thereof, is that the person named or referred to has been guilty of acts of unchastity, irrespective of whether such person has or has not, in the strict legal sense of the word, been made a party in an action prosecuted to obtain a divorce on the grounds of adultery. In other words, when a woman is referred to as a ''co-respondent'' in an action prosecuted by a wife against her husband, the general inference, and the common and accepted meaning of the word, is that the woman so named has been guilty of illicit relations, and that this is true irrespective of whether the woman so named has in fact been made a co-respondent under the strict meaning of the language found in section 1019 of the Code of Civil Procedure, and brought into the action as a party thereto. Thus, if a woman is named in any of the pleadings, or in any of the papers filed in an action, whether for divorce or for separate maintenance, as a co-respondent, the natural and usual conclusion to be drawn from such naming is that such person is of questionable character. We think the result is exactly the same, whether a person is named as a co-respondent in a complaint and answer, or an affidavit or a deposition, or any other instrument in writing which may become a part of the proceeding or record of the proceedings in an action pending between husband and wife, whether for divorce or for separate maintenance. The legal sufficiency of the instrument in writing to constitute the person a co-respondent in which the charge appears is wholly immaterial as to the effect thereof if it appears in such a manner as to give to the general public the impression that the person named is guilty of any of the acts above named. It is the fact of the charge, and not of the sufficiency thereof, that reflects upon the character of the person assailed. We make this preliminary statement because it goes to the very heart of the controversy involved in this action. If, in any of the papers, whether denominated a complaint, an answer, a

cross-complaint, an affidavit or a deposition, filed in the action of *Irvine* v. *Irvine,* appears a charge against the woman named as being co-respondent, and the defendant in its report thereof, stated that such a charge had been made, then and in that case the publication was privileged under the provisions of subdivision 4 of section 47 of the Civil Code. In other words, the truth of the publication, and its being privileged, are not measured by the legal sufficiency of the charge, if the charge is made.

In determining whether the publication is libelous, resort is first had to the publication itself. If it is not libelous, the fact that it is unpleasant is of no moment, and the question of libel or no libel is primarily for the court to determine. If the publication is not libelous, neither inducement nor innuendo can make it so. The inducement may state the facts so as to disclose to the court the person intended, and the innuendo, to explain what is intended, and the usual intendment of the language. In the case at bar there is no need for inducement; the article itself states the names of the women. The innuendo sets forth the meaning and application of the word "co-respondent". From what we have stated it is apparent that the innuendo is of little moment in this case, save and except as coupled with the further pleading, which we will later consider, relative to the sufficiency of the charge of libel in this action.

Before considering further the sufficiency of the counts of the complaint which we have set forth in full, we may state that the law appears to be well settled that the allegations of the falsity of the charge must be as broad as the charge itself. In other words, it is not sufficient to allege that a charge of being a co-respondent is false and untrue, and then limit the meaning of this allegation by setting forth that in no complaint or answer filed in the action, the charge of being a co-respondent does not appear or that the person alleged to be libeled has not been made a co-respondent by reason of not having been served with any summons or complaint in the action, or brought into the action as a party thereto, as it might very well be true that the party alleged to be libeled by being named as a co-respondent has not been made a party to the action, has not been served with summons but has been so characterized

in some paper filed in the action, or even in the testimony adduced at the trial of an action. ▆ If named at all as a co-respondent in the action and publication thereof, if truthful in that it simply states that the person referred to has been so designated, the privilege accorded by subdivision 4 of section 47 of the Civil Code applies. The principles which we have laid down find support in the following cases: *Bathrick* v. *Detroit Post*, 50 Mich. 629 [45 Am. Rep. 63, 16 N. W. 172]; *Hearne* v. *DeYoung*, 119 Cal. 670 [52 Pac. 150, 499]; *Snively* v. *Record Publishing Co.*, 185 Cal. 565 [198 Pac. 1]; *Chavez* v. *Times Mirror Co.*, 185 Cal. 20 [195 Pac. 666]; *Newby* v. *Times Mirror Co.*, 173 Cal. 387 [Ann. Cas. 1917E, 186, 160 Pac. 233]; *Davis* v. *Hearst*, 160 Cal. 143 [116 Pac. 530].

▆ Again, if the article published is substantially true and is inaccurate only as to details which it relates, it is not libelous, nor would the publication be excluded from the protection afforded it by subdivision 4 of section 47 of the Civil Code by reason of any inaccuracy or error in naming the paper or characterizing the writing in which the allegation alleged to be libelous, appears. (*Hearn* v. *DeYoung, supra; Skrocki* v. *Stahl*, 14 Cal. App. 1 [110 Pac. 957].)

▆ If the gist or the sting of the alleged libelous matter is shown to be true, or a truthful statement of the proceedings, no action lies. A restatement of the charge is pertinent here. It is as follows: "Before the Irvine divorce suit got under way, following the completion of Mrs. Irvine's testimony, an additional pleading was filed in which the wife named five women as co-respondents." The gist of the alleged libel or the sting of the charge lies in the naming of the five women as co-respondents, not in whether the written instrument filed in the action was or was not correctly denominated as a pleading, or whether the five women were or were not technically named as co-respondents. If so named in any instrument filed, as we have stated, the mere inaccuracy or error as to naming of the written instrument becomes wholly immaterial. Likewise, if the five women were named as having illicit relations with the husband, then the characterizing of those having such relations as being co-respondents, would constitute no inaccuracy or variation from a correct report of the proceedings sufficient to lay the basis of an action for libel.

In the light of what we have said, we may now examine the sixth paragraph of the plaintiff's complaint, to wit: "That said article so published, as aforesaid, was false, untrue and defamatory; that said Madeline Irvine, plaintiff in said proceedings, at no time in said proceedings named this plaintiff as a co-respondent; that no copy of the complaint and summons in said action was ever at any time served upon this plaintiff; that this plaintiff was not a party to said proceedings; that the complaint in said action filed by said Madeline Irvine, does not, and did not name this plaintiff as a co-respondent; that no amendment to said complaint, so charging this plaintiff with having committed adultery with the defendant therein, was ever filed in said action; that in truth and in fact the said action instituted by Madeline Irvine was based and grounded upon the charge of cruelty, and the acts of cruelty committed by the said James Irvine, Jr., defendant therein, to and toward the said Madeline Irvine." Here, the gravamen of the charge is limited to the fact that no complaint filed by the plaintiff charged the women named as co-respondents. That no summons in said action was ever served, and that the plaintiff here was not made a party in the action of *Irvine* v. *Irvine.* That no amendment to the complaint in the Irvine action was filed charging this plaintiff with having committed adultery, etc., the whole action being limited to the technical fact that no complaint, cross-complaint, or answer was filed in the action of *Irvine* v. *Irvine,* naming this plaintiff as a co-respondent, and that no summons or pleading was ever served upon this plaintiff making her a party to the action of *Irvine* v. *Irvine.* It does not appear, nor is it alleged that there was not an instrument in writing filed in the action of *Irvine* v. *Irvine,* charging the plaintiff with all the acts which the public would generally assume one to have committed in order to become a co-respondent. The whole complaint is based upon the narrow, technical and circumscribed basis that the plaintiff in this action was not so denominated in particular pleadings filed in the Irvine action. And here, again, a narrow, limited and technical meaning is given to the word "pleading", in order to lay the basis for an action of damages, and likewise prevent the truth of the publication to be shown, because, forsooth, the charge may have only appeared in an affidavit or a deposi-

tion, and not in such a manner as to bring it within the definition and meaning which counsel have attached to section 1019 of the Code of Civil Procedure. But little attention need be given to the second and third alleged causes of action; what we have heretofore said applies to them, but a reading of the second and third causes of action shows clearly that they are not libelous. All they do show in relation to the women charged, without naming them, is that the court held that the charges were unproven and were untrue. Nor does it appear from either count that the proceedings, a report of which was published, did not take place, and the language being clearly not libelous, it is not possible, either by inducement or innuendo, to give the articles a sinister meaning which does .not appear upon the face thereof. The whole case appears to be based not upon the falsity of the imputation, but upon the untruthfulness of the publication of the form in which it was made, which led, we think, to the order of the trial court in sustaining the demurrer without leave to amend.

■ From what we have stated, the conclusion is unescapable that the demurrer was properly sustained. The question then occurs: Has there been any abuse of discretion on the part of the trial court? Upon this question nothing further appears in the record than the simple order.

In the case of *Philbrook* v. *Randall*, 195 Cal. 95 [231 Pac. 739, 742], we find the following on page 105: "It is the rule that the granting of permission to amend pleadings is a matter within the sound discretion of the trial court. (*Doolittle* v. *McConnell*, 198 Cal. 697 [174 Pac. 305].) The courts should allow amendments liberally. (*Gould* v. *Stafford*, 101 Cal. 32 [35 Pac. 429]; *San Joaquin Valley Bank* v. *Gate City Oil Co.*, 170 Cal. 250 [149 Pac. 557].) But where the record does not show that leave to amend was asked for (*Butler* v. *Burt*, 6 Cal. Unrep. 917 [68 Pac. 973]; *Duvall* v. *White*, 46 Cal. App. 305 [189 Pac. 324]), there is no abuse of discretion, nor grounds for reversal especially where the record shows several attempts at amendments had been made. (Citing a number of cases.) Where an order sustaining a demurrer is silent as to leave to amend, the judgment may nevertheless be affirmed. (Citing cases.) Nor will error be presumed where the record fails to show that leave to amend was asked for and refused." (Citing

*Aalwyn* v. *Cobe*, 168 Cal. 165 [142 Pac. 79]. See, also, *Stewart* v. *Douglass*, 148 Cal. 511 [83 Pac. 699].)

In *Hansen* v. *Carr*, 73 Cal. App. 511 [238 Pac. 1048, 1051], we find the following: "The granting of leave to amend, after a demurrer is sustained, is of course a matter resting primarily in the discretion of the trial court. Refusal to grant such permission will not be destroyed on appeal in the absence of a showing of abuse of that discretion. (Citing *Kleinclaus* v. *Dutard*, 147 Cal. 245, 252 [81 Pac. 516]; *Stewart* v. *Douglass, supra.*) Where, therefore, the record fails to disclose that leave to amend was requested, and that the application was denied by the trial court, we must assume that no offer of an amendment was made, or otherwise we would be asked to hold that there was an abuse of discretion on the part of the trial court in denying something that was never sought until after the appeal was taken." (Citing a number of authorities.)

In *Whyte* v. *City of Sacramento*, 65 Cal. App. 534 [224 Pac. 1008, 1012], this court had before it the same question, and there said: "The privilege of amending after trial, of issues of law raised by the demurrer, is not one of right but one resting in the discretion of the trial court. If the plaintiff desired again to amend, she should have applied to the court below, and if refused, exception should have been taken. It is too late to make the point for the first time in this court, when nothing appears in the record to show an abuse of discretion." (Citing a number of cases.)

We do not need to review the cases cited by appellant relative to amendments further than to state that an examination of them shows that they are readily distinguishable from the case at bar. There, in each case, the complaint was held to have stated a cause of action. Here, the complaint as filed and presented to us upon appeal is subject to a general demurrer as not stating facts sufficient to constitute a cause of action, for the reasons which we have hereinbefore set forth, which may be succinctly stated as follows: It does not appear that the plaintiff was not charged with being a co-respondent in an instrument in writing filed in the case of *Irvine* v. *Irvine*, nor does it appear that the imputation of being such is alleged to be untrue. The whole complaint is framed upon the theory of the insufficiency of

the form of the charge, and not upon the untruthfulness of the substance thereof.

In addition to the authorities which we have cited showing the absolute insufficiency of such allegations, we may refer to 36 C. J. 1273, where the subject of immaterial inaccuracies is treated. That a false charge of being a co-respondent in a divorce action is libelous *per se,* may be admitted, but the publication of a truthful report that such a charge has been made during the trial of an action is clearly within the protection afforded by subdivision 4 of section 47 of the Civil Code.

The judgments are affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 27, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 23, 1931.