[L. A. No. 6900. In Bank.—June 28, 1923.]

E. P. STEVENS, Respondent, v. THOMAS M. STORKE et al., Appellants.

[1] LIBEL—PUBLICATION OF ARTICLE—CONSTRUCTION.—In determining whether or not, under section 45 of the Civil Code, which defines libel as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation," an article is libelous, it must be considered in its entirety; it may not be divided into segments and each portion treated as a separate unit.

[2] ID.—NEWSPAPER ARTICLE—CONSTRUCTION.—An article constituting a part of an editorial published in opposition to the candidacy of a superior court judge which declares that said judge, "when there has been any matter before his court that was politically dangerous for him to try, he has called in a judge from an outside county"; that he dodged a case in which a certain party was plaintiff by calling in a foreign judge; that said party was the same person who laid a bad pavement, who was employed at $7.50 per day to oversee one man at $2 per day, and who was indicted for an offense and acquitted; that some people wondered how said party's reputation could be damaged $5,000 worth, and that said party "is now working zealously for the re-election of" said judge, is of such a nature that it may fairly be said to expose said party to hatred, contempt, and obloquy, its plain import being that he was a man of such type that the mere fact he was supporting a particular candidate should cause people to vote for someone else.

[3] ID.—CONSTRUCTION OF BAD PAVEMENT—DIRECTION OF STATEMENT AT PLAINTIFF PERSONALLY—PRIVILEGE.—In an action for damages for libel for the publication of such an article, the claim of privilege for the statement that the plaintiff, who was the party named in such article, laid a bad pavement, on the theory that it referred to the manner in which plaintiff performed a public work, namely, the building of public roads, in which taxpayers were interested, cannot be justified where the remark was not intended as criticism of the road work itself, nor was it addressed to plaintiff as a builder of public roads, but was directed at plaintiff personally; and moreover, assuming privilege to exist in the matter of roads, it would not extend to the statement that people wondered how plaintiff's reputation could be damaged $5,000 worth.

[4] ID.—POLITICAL VIEWS OF PRIVATE CITIZEN—PRIVILEGE—COMMENT BY NEWSPAPERS.—While a newspaper stands in such relation to the people that with regard to publications concerning local public officers it comes within the scope of subdivision 3, section 47, of the Civil Code, if the matter published has the other characteristics of a privileged communication, "the duty of a newspaper to the public does not justify the publication of false and defamatory matter concerning a private citizen merely because he is active in promoting his own political views."

[5] ID.—LIBELOUS AND UNPRIVILEGED ARTICLE—MALICE IN FACT—EVIDENCE.—Inasmuch as the article in question was libelous *per se* and was not privileged it was unnecessary for plaintiff to prove malice in fact.

[6] ID.— TRUTH OF ARTICLE—EVIDENCE.—In such action the claim that the plea of the truth of the publication of such article was sustained cannot be upheld in view of the evidence.

[7] ID.—EVIDENCE—MALICE—PRIOR PUBLICATION.—In such an action, where the complaint alleged actual malice and prayed for punitive damages, a prior publication, offered and received in evidence for the sole purpose of proving actual malice, was proper to be considered by the jury on the question of actual malice if they were of the opinion that the prior publication referred to plaintiff; if the jurors were of the opinion that it did not refer to plaintiff, then defendants could not have been harmed by its admission in evidence.

APPEAL from a judgment of the Superior Court of Santa Barbara County. Benjamin K. Knight, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Ford & Bodkin, John T. McCurdy and Leon R. Yankwich for Appellants.

George L. Sanders and John C. Benton for Respondent.

LAWLOR, J.—This action was brought by plaintiff, E. P. Stevens, against defendants, Thomas M. Storke and C. A. Storke, who were respectively the publisher and editor of ''The Daily News and The Independent,'' a newspaper published in the city of Santa Barbara, to recover damages for injury to his ''reputation and good name as a man and a citizen, and in his business as a contractor for the paving of streets and roads,'' and for mental suffering caused by the publication in the said paper of an alleged libelous article of and concerning the plaintiff. The article in question constituted a part of an editorial published in opposition to the candidacy for public office of a judge of

6. Pleading truth as defense in action for libel or slander, notes, 21 L. R. A. 511; 31 L. R. A. (N. S.) 138; 50 L. R. A. (N. S.) 1042.

Evidence admissible on issue of truth of charge, notes, Ann. Cas. 1915D, 890, 906, 907.

7. Proof of other defamatory statements in civil action for libel or slander, note, 12 A. L. R. 1026.

the superior court, whose name is not material here, and is as follows: "Judge —— has been notorious in creeping out from under difficulties by calling in an outside judge. When there has been any matter before his court that was politically dangerous for him to try, he has called in a judge from an outside county. Take the case of *Stevens* v. *Snow,* a libel case, recently tried. The plaintiff was that same Ed. Stevens who laid down the asphalt plaster upon Chapala Street. He is the same Stevens who laid the bad pavement that is found between here and the Bishop ranch. He is the same Ed. Stevens who was employed in the good old times of Conover and the old board of supervisors at $7.50 per day to oversee one man at $2 per day, and 'who in his testimony before the grand jury he denominated as the crew. This is the same Ed. Stevens who was indicted and acquitted by the grand jury a few years ago for some offense against the county treasury. This case was before the Superior Court of the County of Santa Barbara. Judge —— dodged this case, and called in a foreign judge to try the case. Some people have wondered how Ed. Stevens could be damaged in reputation five thousand dollars' worth, but the jury decided that he was. Ed. Stevens is now working zealously for the re-election of Judge ——." It was admitted the article was published and that it referred to the plaintiff.

Upon the trial the court instructed the jury that the article was libelous *per se* and submitted to them only the issues of its truth or falsity and of the amount of damages to which plaintiff would be entitled if they should find it was false. The jury returned a verdict in favor of plaintiff and assessed the damages at $1,000. Judgment was entered for plaintiff upon the verdict and defendants have appealed.

' Appellants contend the court erred in overruling their demurrer interposed to the complaint on the ground that it failed to state a cause of action; in denying their motion for a directed verdict in their favor; in instructing the jury that the article was libelous and unprivileged; in refusing to instruct the jury that the article was privileged and that respondent could not recover without proof of express malice, and in receiving in evidence an article previously published in their paper as tending to establish

malice. It is further claimed the verdict is not supported by the evidence, in that malice in fact was not proved and in that appellants proved their allegation of the truth of the alleged libelous statements.

A determination of these questions depends primarily upon whether or not the article was in fact libelous *per se,* whether or not it was privileged under the circumstances, and whether or not the implied finding of the jury that the facts therein stated were false was justified.

For the purpose of their argument appellants divide the article into four paragraphs, the first containing the statement that respondent laid the bad pavement, the second that he was employed at $7.50 per day to oversee one man at $2 per day, the third that he was indicted for an offense and acquitted, and the fourth that some people wondered how his reputation could be damaged $5,000 worth. It is insisted that there is nothing in the first paragraph which could constitute a libel, as it merely purports to say that a certain piece of public pavement laid by respondent is bad, without blaming respondent for the condition; that criticism of one's goods or of the product of one's labor is not a libel on the producer unless such criticism imports that the person is guilty of deception; that to be libelous the words must impeach a person's knowledge or skill at his occupation, and are not such if they refer to one piece of work only. With reference to the second statement appellants contend that to accuse a person of a lawful act is never libelous, and that this statement only accuses respondent of overcharging for his work, which is a perfectly proper thing to do. Statement three is asserted not to be libelous for the reason that it states respondent was acquitted of the offense with which he was charged, and that while it is libelous to say a person was convicted or guilty of a crime, it cannot be to say that he was acquitted. The fourth statement is claimed to be susceptible of the meaning that respondent's character is so above suspicion that the "claws of calumny cannot reach him," and it is urged that to hold that the statement, "one wondered how a man's reputation could be injured five thousand dollars' worth, is libelous, is to misconceive entirely the nature of the action of libel. . . . A verdict for plaintiff in the sum of one dollar as effectively

vindicates his character as a verdict for thousands.'' It is further insisted that the article is directed at Judge ———; that its force is directed at him, and that plaintiff's name was brought in but incidentally, merely by way of argumentative illustration. In support of these various propositions are cited many authorities.

1. Section 45 of the Civil Code provides: ''Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'' **[1]** In determining whether or not, under this definition, an article is libelous, it must be considered in its entirety. It may not be divided into segments and each portion treated as a separate unit. (*Van Vactor* v. *Walkup*, 46 Cal. 124; *Brewer* v. *Chase*, 121 Mich. 526 [80 Am. St. Rep. 527, 46 L. R. A. 397, 80 N. W. 575]; *Graves* v. *Waller*, 19 Conn. 90.) Thus, in *Bettner* v. *Holt*, 70 Cal. 270 [11 Pac. 713], it was held that in determining whether or not a libel was charged, ''a court of justice is to put such construction upon the words which it contains as may be derived 'as well from the expressions used as *from the whole scope and apparent object of the writer'* (*Spencer* v. *Southwick*, 10 Johns. (N. Y.) 259; *Cooper* v. *Greely*, 1 Denio (N. Y.), 358).'' (Italics ours.)

**[2]** The article concerning respondent in the case before us manifestly was published to disparage him, its plain import being that he was a man of such type that the mere fact he was supporting a particular candidate should cause people to vote for someone else. In our opinion the remarks were of such a nature that they may fairly be said to expose respondent to hatred, contempt, and obloquy.

Considering the statement that respondent laid the asphalt plaster and bad pavement, although appellants have argued and cited cases to the point that criticism of one piece of work is not libelous, ''disparagement of property may involve an imputation on personal character or conduct, and the question may be nice, in a particular case, whether or not the words extend so far as to be libelous . . .'' (*Dooling* v. *Budget Pub. Co.*, 144 Mass. 258 [59 Am. Rep. 83, 10 N. E. 809].) The quality of the pavements was

not involved in the article; there was no criticism of respondent's streets as a "matter of public interest and concern" which everyone might comment upon provided he did so honestly and without malice. (*Bearce* v. *Bass,* 88 Me. 521 [51 Am. St. Rep. 446, 34 Atl. 411].) When read in connection with the remainder of the article, it is apparent the comments were directed at respondent personally, one of the reasons advanced why his support of the judge's candidacy should lead people to vote against him, being that *respondent* had put in the asphalt plaster and the bad pavement. The context shows the remark to be a personal attack on respondent because of the manner in which he had done the work.

In this connection, it may be stated that in our opinion the evidence does not support appellants' contention that if respondent ever was a road builder or contractor he had ceased to be one at the time the article was published, and therefore could not be injured by reflections relating to that occupation. Respondent testified that it was not true he had never bid on nor sought contracts for the paving of streets; that at the time the article was written he was contracting, not to lay roads, but to mix the material at his plant in connection with laying the roads; that he had made a bid to lay one piece of pavement as well as furnish the asphalt during the five years preceding the trial. In response to a question as to what roads he had laid as a contractor during that period he stated he had not been in the contracting business at all. It appears from the evidence that the work respondent did on the Bishop Road and Chapala Street was to furnish and mix the asphalt; that on Chapala Street he also did certain grading. This was such work as he was still doing regularly as part of his occupation.

With respect to the statement that respondent accepted $7.50 per day from the board of supervisors for overseeing one man who was paid $2, it may be, as argued by appellants, that such conduct on respondent's part would not actually be criminal. But it plainly indicates that he was charging the county for negligible services, which, together with the statement that he had put in the bad roads, was clearly calculated to prejudice him among the taxpayers.

The last statement, that some people had wondered how respondent's reputation could be damaged $5,000 worth, is not susceptible of the construction placed upon it by appellants—that respondent's reputation was so unblemished it could not be harmed. When it is considered with the remainder of the article it could mean only that his reputation was so poor some people wondered that it could be worth $5,000. The effect of such a statement would be to expose respondent to contempt. In their answer appellants have alleged that ''the reason why the persons hereinbefore named expressed wonder and surprise how plaintiff could be damaged by said article [the one alleged to be libelous in *Stevens* v. *Snow*] was and is that said article is not libelous.'' But the article does not state that people wondered how the article involved in the case of *Stevens* v. *Snow* had damaged respondent $5,000 worth, but that they had wondered how he could be damaged in reputation $5,000 worth. The statement is not limited to the effect of the verdict in *Stevens* v. *Snow*, but is a general attack on respondent's reputation.

In support of their contention that the force of the publication is spent on the judge, appellants have cited *Diener* v. *Star-Chronicle Publishing Co.*, 230 Mo. 613 [33 L. R. A. (N. S.) 216, 132 S. W. 1143]. The alleged libel in that case consisted of part of an article urging the defeat of a candidate for coroner, and contained the following: ''Isn't Coroner Jules C. Brown, present incumbent and candidate for re-election, the public official who joined with the police in letting Health Commissioner Bond's chauffeur go free, without bond or charge or investigation, after the latter had run down and killed a little child in the street, and if he is, would this be a good reason for continuing his term of service?'' The court decided the use of the word ''killed'' did not import a criminal killing and as one fact tending to show how strained such an interpretation would be, it was pointed out that the article was directed at the coroner and that the plaintiff was mentioned but incidentally. In view of that fact it was held the chauffeur could not maintain an action for libel. But there is nothing to show that had the words spoken of the chauffeur actually imported a felonious killing they would not have been libelous merely because the article in which they were contained referred chiefly to someone else.

2. Appellants contend that the article was qualifiedly privileged and that respondent's failure to prove malice made the privilege absolute, in that in publishing the remarks concerning him appellants were acting as interested parties communicating matters to others who were also interested in the subject. First, it is insisted that the article referred not to respondent's private affairs, but to the manner in which he performed a public work, namely, the building of public roads, in which taxpayers were interested (citing *Bearce* v. *Bass, supra*), and, second, that by espousing and advancing the candidacy of the judge he became for the time a public man concerning whom comments might be made under the asserted privilege on the ground that the public at large were affected by his acts. (Odgers on Libel and Slander, 5th ed., p. 193; *Flanagan* v. *Nicholson Pub. Co.,* 137 La. 588 [Ann. Cas. 1917B, 402, L. R. A. 1917E, 510, 68 South. 964].)

[3] In our opinion neither of these claims of privilege is justified. As pointed out above, the remarks were not intended as criticisms of the road work itself, nor were they addressed to respondent as a builder of public roads. They were directed at respondent personally. Moreover, assuming the privilege to exist in the matter of the roads, it would not extend to the statement that people wondered how respondent's reputation could be damaged $5,000 worth. [4] Concerning the second claim, while it has been held that a newspaper stands in such relation to the people that with regard to publications concerning local public officers it comes within the scope of subdivision 3, section 47, of the Civil Code, if the matter published has the other characteristics of a privileged communication (*Snively* v. *Record Publishing Co.,* 185 Cal. 565 [198 Pac. 1]), "the duty of a newspaper to the public does not justify the publication of false and defamatory matter concerning a private citizen merely because he is active in promoting his own political views." (*Newby* v. *Times-Mirror Co.,* 173 Cal. 387, 394 [Ann. Cas. 1917E, 186, 160 Pac. 233].)

[5] Inasmuch as the article was libelous *per se* and was not privileged it was unnecessary for respondent to prove malice in fact (*Davis* v. *Hearst,* 160 Cal. 143 [116 Pac. 530]; *Snively* v. *Record Publishing Co.,* 185 Cal. 565 [198 Pac.

1]), and we need not consider appellants' contentions on that subject.

[6]   3. In support of the claim that the plea of the truth of the publication was sustained, appellants cite *Hearne* v. *De Young,* 119 Cal. 670 [52 Pac. 150, 499], to the effect that "a defendant is not required in an action of slander or libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified. Immaterial variances and defects of proof upon immaterial matters go for nothing, and if the gist of the charge is established by the evidence, the defendant has made his case." As proving the truth of the statement that respondent was paid $7.50 per day for overseeing one man, we are referred to the testimony of one F. F. Curry, who stated that he was a laborer employed under respondent at the La Paterra switch, where part of the work for the road to Bishop ranch was being done; that part of the time there were other persons working with him under respondent and part of the time there were not; that he thought he was working alone on December 21, 22, and 23, 1914. Respondent also testified that at that time he was working as superintendent of the asphalt plant at the switch and that he had only F. F. Curry working there, removing an obstruction so the cars could get by. But from his testimony it appears that at about the same time he also had six or seven men working at the same place shoveling back a bulkhead which had caved in during a rain, and that he had sixteen or seventeen men working at the asphalt plant.

As demonstrating the truth of the statement concerning the value of respondent's reputation, it is pointed out that James Ross, sheriff of the county, stated that at least a dozen people wondered at the size of the verdict in the case of *Stevens* v. *Snow,* and appellants state: "Now, when a dozen or so people expressed surprise at the size of the verdict in plaintiff's favor in the libel action of *Stevens* v. *Snow,* which fact was brought to the attention of one of the defendants, it was legitimate for him to infer that these same people wondered how the plaintiff's reputation could be injured in that amount and to so state." This reasoning cannot be held to justify the alleged libelous statement. As already indicated, the wonderment as reported in the article was not confined to the size of the verdict in the particular

case of *Stevens* v. *Snow*, but was as to "How Ed Stevens
could be damaged in reputation five thousand dollars'
worth." For this reason, the statement that "the jury de-
cided he was" does not take the sting from the article.
Even if the testimony referred to were the same as the re-
mark published, it alone would not justify the publication.
"If A says B is a thief, and C publishes the statement that
A said B was a thief, in a certain sense this would be the
truth, but not in the sense that the law means. It would
constitute no defense to C, for it would be but a repetition
by him of a slanderous charge. His defense must consist in
showing that in fact B is a thief." (*Gilman* v. *McClatchy*,
111 Cal. 606, 612 [44 Pac. 241, 242].)

Appellants contend that if there is any libel in the state-
ment that respondent laid the bad pavement, the sting is
"not that plaintiff physically 'laid' the Goleta road [the
road to Bishop's ranch], *but that the road*, with the building
of which plaintiff was connected, is *bad*. The truth of this
'sting' the defendants have established, by showing that the
improper preparation and mixture of the asphalt, for which
plaintiff is chiefly responsible, is the cause of the bad con-
dition of the road." A mass of testimony was introduced
by the parties upon this issue as tending to prove whether
or not respondent could be said to have laid the pavement
and whether it was in fact bad. Experts were examined
and extended discussions were entered into respecting the
characteristics of asphalt and the various methods of pre-
paring it for use in pavements. Appellants refer to the
testimony of witnesses P. B. Jolley and Peter Irvine, who
were employed in building the roads in question, and to that
of A. W. Conover, who was a member of the board of super-
visors when the roads were put down. According to these
witnesses, respondent had charge of the heating of the as-
phalt for the pavements, but did not supervise the laying
of it, although he often conferred with those in charge of
laying it concerning the progress of the work. The witness
A. W. Conover stated that he, not respondent, was respon-
sible for the roads and that Peter Irvine was employed to
oversee the entire work. Witnesses Samuel Bingham and
A. S. Cooper testified that because of burned spots the Chap-
ala pavement was not good and that there were a few such
places in the Bishop Road. On the other hand, respondent

stated the Bishop Road was a good one and the witness P. B. Jolley stated that no burned material went into it, that the material was first class and that the asphalt was tested by a man named Fast, a county inspector. Frank F. Flournoy, who was county engineer at the time, stated that when the Bishop Road was laid, "the gutters or drain ditches were all cleaned out and the material from those gutters and drain ditches was piled upon the roadbed. After the winter's rain came down from the mountains through these different creeks—I think something like three or four creeks crossed this road—it filled up these gutters to a point higher than the roadbed. . . . It filled up the drain ditches and left the water underneath the asphaltum, and the asphaltum would not hold up with a water-soaked foundation." Respondent testified that apart from the two-mile section which was broken up on account of overflow water the road was good, and that the portion so broken up was good aside from the effect of the water. Both these witnesses and Charles Winters testified there was no change in the road for three or four years after it was put in, that it lasted that length of time before the damage from the water was done.

With reference to the defect in the Chapala pavement, that the asphalt was burned, respondent testified that "the city had a man to look after that proposition [the heating of the asphalt] at the plant, and he was the man that took the degrees of heat. I do not know anything about to what degrees it was het, to tell you the truth"; that "we were doing the work on that Chapala Street job under two inspectors, and we tried to follow the instructions of the inspector, as much as we possibly could." From all this testimony the jury might have concluded that respondent was not to blame for the bad condition of the Bishop Road, but that it was due to action of the elements, and that, assuming the asphalt on Chapala Street actually was burned, the city inspectors, and not respondent, were responsible.

[7] There was no prejudicial error in admitting in evidence the prior publication of October 1st. This was offered and received in evidence for the sole purpose of proving actual malice, and its effect was carefully limited to that subject by the court in its instructions. This was a material issue in the case because the complaint alleged actual malice and prayed for punitive damages. If the jurors were of

the opinion that the publication of October 1st referred to the respondent, it was proper to be considered by them upon the question of actual malice. (*Scott* v. *Times-Mirror Co.*, 181 Cal. 345 [12 A. L. R. 1007, 184 Pac. 672]; *Earl* v. *Times-Mirror Co.*, 185 Cal. 165 [196 Pac. 57].) If they were of the opinion that it did not refer to the respondent we are unable to see how the appellants could have been harmed by its admission in evidence.

The judgment is affirmed.

Waste, J., Myers, J., Kerrigan, J., Lennon, J., Seawell, J., and Wilbur, C. J., concurred.