[Civ. No. 16477.   Second Dist., Div. One.   Sept. 13, 1948.]

EDWARD C. WASHER, Plaintiff and Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association) et al., Defendants and Appellants.

Vincent W. Hallinan and William H. Mackay for Plaintiff and Appellant.

Louis Ferrari, G. D. Schilling, Kenneth M. Johnson and Herbert W. Erskine for Defendants and Appellants.

DORAN, J.—The action herein was instituted by Edward C. Washer, formerly an employee of the Bank of America, to recover damages for libel and slander involved in the admitted publication by the bank through its personnel director and vice-president, A. Fenton, of the following statement:

"We cannot see how this institution could possibly reinstate anybody who has admittedly falsified his expense account, who has been guilty of flagrant insubordination, and who has called the inhabitants of the community in which he was working 'yokels' and 'country bumpkins', and labelled the town 'Siberia'.

"The next move is up to NLRB, which must go to court for an order of enforcement. If necessary, we will contest Washer's reinstatement to the highest court in the land."

The above statement was delivered by respondents to the Associated Press, other news services, and to San Francisco newspapers, for publication as the bank's comment on an order of the National Labor Relations Board, directing the bank to reinstate Washer in its employ, and was widely published. In this connection it may here be noted that the court order for enforcement, mentioned in the publication, was approved in *National Labor Relations Board* v. *Bank of America*, 130 F.2d 624; Washer was reinstated in July, 1943, and was paid $5,500 representing earnings from the time of discharge in November, 1937 to the date of reinstatement. It further appears that in October, 1943, Washer was discharged by the bank for proper cause.

Disclosed by the record herein are the following facts leading up to Washer's discharge from employment, the publication of the alleged libel, and the present action. In March of 1935, plaintiff, a nonpracticing lawyer, secured a position in the bank's trust department in Los Angeles at a salary of $125 per month. In April, 1937, the Wagner Act [49 Stats. 449, 29 U.S.C.A. § 151 et seq.], creating the National Labor Relations Board, was held constitutional, and protected by the provisions of the act, Washer proceeded in an attempt to unionize the bank's employees. Thereafter plaintiff was sent to Chico, California, for the stated purpose of acquiring small town branch experience, and assigned clerical duties. On November 6, 1937, the bank's vice-president and senior trust officer, W. J. Kieferdorf, requested that plaintiff come to San Francisco. The conference required a two days' stay in San Francisco, and according to plaintiff's testimony, Kieferdorf then advised Washer to practice law or to seek employment in some other bank; plaintiff's union labor activities were also a subject of discussion. Thereafter, Washer presented to the bank an expense account of $15.12, made up of $6.12 for railway fare, $4.00 for meals, and $5.00 for lodging. Upon a request by the bank for a more complete itemization, plaintiff advised the bank, as found by the trial judge in a memorandum opinion filed at the time of granting defendants' motion for judgment notwithstanding the verdict, "that his failure to itemize his expenses was due to the fact that he did not stay at a hotel, but stayed with friends at a private home, and thus became obligated to them, and had reciprocated by entertaining them." Thereafter, on November 24, 1937, the bank approved and paid the expense account. About this same time Washer mailed 5,000 circular letters to bank employees, setting forth, accord-

ing to the memorandum opinion, "his personal history, and the disciplinary plight he found himself in, stranded in the 'Siberian' town of Chico, all because of his union organization.

Edward C. Washer was, on November 27, 1937, discharged from the service of the bank; in June, 1938 the National Labor Relations Board issued a complaint against the bank, alleging unfair labor practices in Washer's discharge; the bank alleged as reasons for such discharge, plaintiffs "unsatisfactory service, lack of qualification, the rendering of a false expense account, and insubordination and insolence to superior officers." The alleged defamatory publication, as hereinbefore indicated, followed the National Labor Relations Board decision against the bank, and was made, as found by the trial court, when "the Press, who were about to publish an article upon the decision, solicited Mr. A. Fenton, Vice President and Personnel Director, asking whether he desired to publish a statement on the part of the bank to accompany the press story, and express the views of the bank as to the decision."

In addition to the judicial and other proceedings hereinbefore referred to, the Washer case came before the Supreme Court of this state in *Washer* v. *Bank of America*, 21 Cal.2d 822 [136 P.2d 297, 155 A.L.R. 1338], after an appeal from a judgment for defendants upon the sustaining of demurrers to the complaint. The judgment was there reversed, the court holding that a statement charging the falsification of a bank employee's expense account tended to injure the employee in occupation, and was to that extent actionable *per se*. There have been two trials of the case upon its merits before different juries. The second trial resulted in a verdict of $60,000 compensatory damages, together with an award of $75,000 as exemplary damages against the bank and $5,000 against the defendant Fenton. On the first trial the verdict appears to have been $15,000 less, after which a new trial was granted, the trial judge being of the opinion that the verdict was "clearly excessive when viewed in the light of the evidence."

After the second trial a motion for judgment notwithstanding the verdict was granted, upon the ground, as stated in the trial judge's "Memorandum Opinion," that "This Fenton article, published as an addendum and part of the new article of the press, far from being libelous, could be interpreted to mean nothing more than an opposition to the National Labor Relations Board ruling on those asserted issues raised before

the Board, with a purpose to contest and prove them before the court. The publication of August 7th, 1939 was a reiteration of published charges made in defense of the Bank's position in an official proceeding authorized by law, with an avowment to maintain these charges as defenses through the courts of the land.'' In passing on the motion, the trial judge also found that ''The verdict in this case is excessive, and would appear to be influenced by passion and prejudice.'' Both parties have now appealed; the plaintiff from the judgment notwithstanding the verdict, and the defendants under the provisions of rule 3(b) (2), Rules on Appeal, 22 Cal.2d 2, from the original judgment in plaintiff's favor based upon the verdict of the jury.

As indicated in the foregoing statement, the controversy between Washer and the Bank of America has occupied the time, attention and efforts of many courts, judges, administrative tribunals, and others over a period of more than 10 years. The record also indicates that, in one way or another, Washer's alleged labor union activities and the decision of the National Labor Relations Board that the bank had violated the Wagner Act in discharging the employee, have overshadowed all else, and, in effect, have beclouded the real issues in the present action. It must at all times be remembered that in no sense is the present controversy what is commonly termed a battle between management and labor;—it is neither more nor less than a libel and slander action.

The immediate and most important question raised on this appeal is, obviously, whether the trial judge was justified in vacating the verdict of the jury which was in Washer's favor, and rendering a judgment *non obstante veredicto* in favor of the defendant bank. That it is not only the right but the duty of a judge to grant such a judgment in a proper case, goes without saying. Section 629 of the Code of Civil Procedure provides that ''When a motion for a directed verdict, which should have been granted, has been denied and a verdict rendered against the moving party, the court, at any time before entry of judgment, either of its own motion or on motion of the aggrieved party, shall render judgment in favor of the aggrieved party notwithstanding the verdict.''

As stated in *Estate of Arnold*, 16 Cal.2d 573 [107 P.2d 25], and elsewhere, the trial court has power to enter a judgment notwithstanding the verdict when it could and should have in the first instance directed a verdict, and so far as the

sufficiency of evidence is concerned, the same rules apply as in the case of a motion for a directed verdict. ▆ It is likewise settled that the trial court may direct a verdict "where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, will be compelled to set aside a verdict returned in opposition to it." (*Wilkinson* v. *United Railroads*, 195 Cal. 185, 204 [232 P. 131], quoting from *Davis* v. *California Street C. R. R. Co.*, 105 Cal. 131 [38 P. 647].)

One of the outstanding features of the instant case is that the record reveals no substantial conflict of evidence in reference to any vital issue. There is, for example, no conflict whatsoever as to what was published, nor in regard to the circumstances under which the alleged defamatory publication was made. And there can be no doubt that the publication was intended to mean, and does mean, exactly what it says; no more and no less.

Both parties to this appeal have, to a considerable extent, wandered from the main issue in treating the matter as a labor controversy rather than a libel case, and to that extent the briefs filed are not helpful. In the appellant Washer's briefs much stress is laid upon the previous holdings in plaintiff's favor by the National Labor Relations Board and the approval of such decision in 130 F.2d 624. As pointed out by the trial judge in granting the judgment notwithstanding the verdict, such decisions have no bearing whatsoever upon the issues in the present libel action and determine nothing in respect thereto. Therefore the records in those proceedings have no proper place in the instant appeal. And in like manner it may be said that the verdict of the jury rendered in the first trial of the libel action, has no bearing upon the present appeal.

The granting or denial of a motion for judgment notwithstanding the verdict, being governed by the same rules as apply to a directed verdict, involves, as was said in *Wilkinson* v. *United Railroads*, 195 Cal. 185, 204 [232 P. 131], previously cited herein, "the exercise of a sound judicial discretion."

▆ When passing upon an appeal from a judgment notwithstanding the verdict, it is the duty of a reviewing court to review the testimony in the light most advantageous to the plaintiff; to resolve all conflicts in plaintiff's favor, and as well to give plaintiff the benefit of every fact pertinent to the issues involved which can reasonably be deduced from the evidence. If from such consideration it appears that there is

substantial evidence to support every essential element of plaintiff's case, the verdict of the jury cannot be set aside, and a judgment notwithstanding the verdict is erroneous.

But where, as in the case at bar, it is manifest that reasonable minds can draw but one inference, and that inference points inevitably to the falsity of the expense account rendered by plaintiff to defendant bank, as well as the truth of the charge of insubordination, then the law will step in and forbid a recovery under the verdict. From a review of the record herein it appears as a matter of law that no reasonable conclusion is legally deducible from the evidence other than would sustain a verdict for the defendants, and that any other holding by the trial court would have been so lacking in evidentiary support that an appellate court would be impelled to reverse it upon appeal. The trial court was therefore justified in taking the case from the jury and rendering the decision.

Libel, as defined by section 45 of the Civil Code, "is a false and unprivileged publication by writing, printing, [etc.] . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." In granting the motion for a judgment notwithstanding the verdict, the trial court found, and such is the evidence, that Washer did actually render a false expense account to the bank, and one known to be false. Washer had not, as was thereafter admitted in letters to the bank, expended $4.00 for meals and $5.00 for lodging in connection with the trip; the lodging had been with friends, and Washer, for the avowed purpose of liquidating a supposed social obligation, had entertained such friends.

The expense account filed, then, was not a true statement of what had happened, but constituted an arbitrary, artificial, and entirely untrue version. That the total expense item was, as Washer claims, nominal or reasonable for such a trip, or that the bank finally paid the same, does not in any manner alter the above facts. Since Washer, in a letter to the bank dated November 23, 1937, clearly admitted that the expense account as filed, was incorrect, it cannot be said that the bank's published statement referring to the employee "who has admittedly falsified his expense account," was a false statement. And obviously, if it was not a false statement, it was not libel under the code section defining that tort.

The same may likewise be said in respect to the bank's alleged libelous publication that Washer had been "guilty of flagrant insubordination." The term "insubordination," according to Webster, means "disobedience to authority"; the new Standard Dictionary defines it as meaning "not subordinate or obedient; not submitting to authority; rebellious, mutinous." These definitions seem to quite clearly describe Washer's conduct towards the employer bank. The insubordination referred to, was, of course, correlated to the incident of the expense account, and, as found by the trial court, "Though the account was paid, the Plaintiff never obeyed the request to prepare a descriptive statement of expenses. In an institution of 8,000 employees, where respect for and obedience to rules is necessary for the orderliness and rhythm of business and employment relation, refusal—and persistent refusal to so abide, is insubordination; and the more so when the recalcitrant in his refusal belittles and chides his senior officer!"

Even when most favorably considered, Washer's general rebellious attitude displayed not only in reference to the expense account, but otherwise, clearly shows that the charge of "flagrant insubordination" was substantially true. For example, one of plaintiff's letters, dated November 17, 1937, characterizes Vice-president Kieferdorf's letter as "one of a series of petty annoyances," and criticizes "the vice president and senior trust officer of America's largest bank" for correspondence "regarding such a petty detail" as the expense account in question. Another letter to Kieferdorf sarcastically mentions "my past experiences with other 'friends' among the officers of the Trust Department, coupled with my present 'enviable' position," and asks, "am I to be criticized for not appreciating help which must be described as invisible, intangible, and inedible." That such letters were intended to be as insolent as the language imports is evident from the writer's testimony that "I certainly wanted to tell him what I thought, and I was angry." Washer, according to the testimony, was "just plain mad at them (the Bank)."

Again, plaintiff's rebellion at being transferred to the branch bank at Chico, California, otherwise denominated as "Siberia," is made clearly apparent. To Vice-president Kieferdorf, Washer said: "You are not going to make a yokel out of me"; to Vice-president Brandt was written, "I hate this hell-hole," again referring to Chico; Washer wishes to "get out of

the sticks." The plaintiff "had refused to be transferred to branches prior to that." At the first trial Washer claimed to be "the only employee who was in a position to *defy* the Bank of America," there referring to union activities. (Italics added.)

In addition to the so-called "petty annoyance" and "inedible" letters, referred to above, and many corroborative episodes, must be remembered the circular or "broadside" prepared by Washer and sent to some 5,000 bank employees and 495 branch banks, hereinbefore mentioned. That the plaintiff employee openly exhibited a defiant, insubordinate attitude toward the employer bank can hardly be doubted. And, under these circumstances the publication in question cannot be deemed libelous.

There can be no disagreement with the assertion in *Davis* v. *Hearst*, 160 Cal. 143, 195 [116 P. 530], that "the truth, whenever discovered, is a complete defense to the defendant." And, in *Hearne* v. *De Young*, 119 Cal. 670, 674 [52 P. 150, 499], and elsewhere, the correlative proposition is laid down that, to establish the truth of a publication, the defendant need only show that the alleged libelous statement was substantially true. ■ Although the defense was pleaded in the instant litigation, and obviously was a most important issue, appellant Washer's briefs apparently evade this question. Much of the Washer briefs has reference to the matter of supposed malice on the part of the bank, and the supposed general honesty and good faith on the part of the employee. But this matter of malice, or the lack of it, becomes entirely immaterial if the published statement is substantially true, as it appears to be in this case.

■ It is also true that, as stated in *Stevens* v. *Storke*, 191 Cal. 329, 334 [216 P. 371], "In determining whether or not, under this definition [Civ. Code, § 45], an article is libelous, it must be considered in its entirety. It may not be divided into segments and each portion treated as a separate unit."
■ And, as found by the trial court, the article in question, "published as an addendum and part of the news article of the press, far from being libelous, could be interpreted to mean nothing more than an opposition to the National Labor Relations Board ruling." Obviously, it would be an absurdity, contemplated neither by the Wagner Act nor by any other valid enactment or decision, to hold that an employer should be penalized by way of damages for publishing, as a part of

a news article announcing a National Labor Relations Board decision, its intended opposition to the order made, and the reasons why the bank felt that the employee, Washer, should not be reinstated.

In reference to the judgment rendered, the trial court correctly found that "The verdict in this case is excessive, and would appear to be influenced by passion and prejudice. . . . In fact, in his several employments since the alleged libel, he has earned much more than priorly. . . . An award of $80,-000 punitive damages can only be the product of an impassioned mind." It may be added that, not only could an excessive verdict result from passion and prejudice, but the same nonjudicial condition of mind could likewise produce a finding of libel where, actually, under the law, no such finding was justified. Such being the case, it must be repeated that it was not only the right, but the duty of the trial judge to set aside the verdict herein and render a judgment consonant with law and evidence.

The bank's appeal from the original judgment in plaintiff's favor, taken, as aforesaid, under the provisions of rule 3(b) (2), is *ipso facto* disposed of by the decision herein reached affirming the judgment notwithstanding the verdict. It is therefore unnecessary to enter into a discussion of the various assignments of error presented by the appellant bank.

The judgment notwithstanding the verdict is affirmed, and the prior judgment based on the jury's verdict is reversed.

York, P. J., and White, J., concurred.

A petition for a rehearing was denied September 30, 1948, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied November 12, 1948, with Peek, J., and Bray, J., sitting pro tem., for Edmonds, J., and Carter, J.